BRUCE L. ROTHROCK CHARITABLE FOUNDATION, Appellant,

v.

ZONING HEARING BOARD OF WHITE-HALL TOWNSHIP and Robert F. Brennen, Whitehall Township, and Whitehall Township Board of Commissioners.

Commonwealth Court of Pennsylvania.

Argued Sept. 22, 1994.

Decided Dec. 6, 1994.

---

James G. Kellar, for appellant.

F. Paul Laubner for appellee Zoning Hearing Bd. of Whitehall Tp.

Timothy Siegfried, for appellee Whitehall Township.

George A. Heitczman, for intervenor Robert F. Brennen.

Before COLINS, President Judge, and FRIEDMAN, J., and KELTON, Senior Judge.

FRIEDMAN, Judge.

Bruce L. Rothrock Charitable Foundation (Applicant) appeals from an order of the Court of Common Pleas of Lehigh County (trial court) affirming the decision of the Zoning Hearing Board of Whitehall Township (Board). The Board denied Applicant's request to rebuild a partially destroyed building that had housed a nonconforming use, and the Board also denied Applicant's alternative request for a variance. We affirm.

Prior to 1977, Applicant's property had been used principally as an automobile dealership, Rothrock Motor Sales. Although located in a residential zoning district, the automobile dealership pre-existed enactment of a zoning amendment which placed the property in a residential zone and, thus, was permitted to continue as a pre-existing nonconforming use.[1] In 1977, the auto dealership moved to another location, (R.R. at A544), but, according to Bruce L. Rothrock, the owner of the dealership and the head of Applicant,[2] the building continued to be used, mainly for storage. In December 1983, a fire damaged the building to such an extent that electrical service to the building was discontinued, the windows and doors were boarded up, and boards were placed over a portion of the roof which had been destroyed by the fire. (Board's Findings of Fact, Nos. 17, 24 and 25; R.R. at A552.)

Section 1301 of the Whitehall Township zoning ordinance governs nonconforming buildings and uses. Sections 1301.1, 1301.2 and 1301.5 are pertinent to this case. With regard to abandonment, Section 1301.1 provides:

*Abandonment.* The non-use of a nonconforming use or building for a period of one (1) year or more shall be deemed an abandonment, and, thereafter, the nonconforming use shall be resumed only upon conformity with the regulations of the district in which it is located.

With regard to changes in nonconforming uses, section 1301.2 provides:

*Changes.* A nonconforming use all or partially conducted in a building or buildings may be changed to another nonconforming use only upon determination by the Zoning Hearing Board, that the proposed new use will be no more detrimental to its neighborhood and surroundings than the use it is to replace. In determining relative "detriment," the Zoning Hearing Board shall take into consideration among other things: traffic generated; nuisance characteristics such as emission of noise, dust and smoke; fire hazard; and hours and manner of operation.

And with regard to restoration of a partially or completely destroyed nonconforming use, section 1301.5 provides:

*Restoration.* If a nonconforming building is partially or completely destroyed by any cause whatsoever, it shall not be rebuilt or reoccupied except in conformity with the regulations of the district in which it is located unless reconstructed [sic] thereof is commenced within six (6) months following the date of such whole or partial destruction and carried to completion within a reasonable period of time.

In 1989, an agent for Applicant, Robert Grayson, submitted an application for a hearing before the Board, requesting a variance from section 1301.5 of the zoning ordinance to permit the building to be restored and used (1) to store antique, classic and exotic vehicles and to repair those vehicles when

1. Other nonconforming uses, such as auto repair and storage, also continued as uses accessory to the principal nonconforming use.

2. Bruce Rothrock transferred the property to Applicant by deed dated December 30, 1986. (R.R. at A899.)

necessary, (2) as a storage/warehouse for related parts, supplies and files, and (3) as office space for private use. (R.R. at A925.) After various hearings, appeals and remands,[3] the application was amended. (R.R. at A457–84.) The Board treated the amended application as a request for an interpretation of the zoning ordinance to permit continuance of a nonconforming use and, in the alternative, for a variance. (Board's Op. at 1.)

Before the Board, various parties offered conflicting testimony with regard to the continued use and the condition of the property. Applicant contended that the property had continued to be used for storage and repair of motor vehicles, storage of personal belongings, storage of corporate records and storage of commercial auto parts. (Board's Findings of Fact, No. 14.) Applicant also claimed that an office use existed on the premises despite the absence of office equipment, telephone service, bathroom and electric power.[4] (Board's Findings of Fact, No. 20.) However, other testimony showed that by 1988 and 1989 the building contained mostly debris. (Board's Findings of Fact,

No. 23.) Testimony also showed that the sole access to the building was through a boarded up door which required a pry bar or hammer to open. (Board's Findings of Fact, No. 24.) The Board found that no construction or renovation was performed on the structure but, rather, that repairs were limited to securing the building.[5] (Board's Findings of Fact, No. 25.) In addition, the Board noted that Applicant listed the property for sale as commercial property despite the fact that the property is zoned for residential and related uses[6] and that an appraisal report for a prospective purchaser indicated that the "highest and best use of the property would be for razing of the existing building and for construction of four (4) townhouses of two (2) sets of twin dwellings," (Board's Findings of Fact, No. 32), with an expected sales price of each dwelling unit in the $110,-000 to $120,000 range.[7] (R.R. at A966.)

The Board denied Applicant's request to permit continuation of a nonconforming use, determining that (1) the prior nonconforming uses had ceased, or been abandoned; (2) continuation of uses which had been accessory to the nonconforming use before its move

---

**3.** The trial court summarized the complicated case history as follows:

> A hearing on the variance application was held by the Board on June 22, 1989 and the application for a variance was denied. After an appeal from the decision of the Board, the Honorable Maxwell E. Davison remanded the case to the Board for further findings on September 6, 1989. Another hearing was held and the case was remanded again on July 19, 1990. After further findings of fact, we are presented with the appeal from the Board's denial of a variance.

(Trial Ct. op. at 3–4.) This appeal is from an order of the trial court affirming the Board's decision of November 20, 1990.

**4.** At the time of the Board's decision, the property had had neither water service nor electric power since 1983; no mail had been delivered to the property for six or more years; and no business privilege tax, allowing the conduct of a business on the property, had been paid since 1978. (Board's Findings of Fact, Nos. 17, 18 and 19.)

**5.** The record indicates that Rothrock received insurance payments of $115,779.92 for damage to the building and contents ($96,779.92 for damage to the building and $20,000 for damage

to the contents) from one insurance company and a second payment of approximately $45,000 to $50,000 for damage to the contents. (R.R. at A618, A958.) It was estimated that renovations to the building would cost between $115,000 to $200,000. (R.R. at A152 and A952–57.)

**6.** According to the Board, the following uses are permitted in an R–2 Residential Zone:

> (1) Any use permitted in an R–1 Zone.
> (2) Single family, semi-detached dwellings (twins), provided that the party wall with the adjoining single-family semi-detached dwelling is erected at the same time.
> (3) Two-family detached dwellings.
> (4) Multiple dwellings, provided that sanitation facilities are adequate to accommodate the proposed use.
> (5) Clubhouses, lodges, or social organizations not conducted for profit, when not operated by or in connection with a public tavern, cafe or other place of business without any other features likely to occasion a nuisance in a residential neighborhood by reason of noise or other objectionable characteristics.

(Board's Op. at 23.)

**7.** Testimony indicates that the property was listed for sale at $175,000 and that two interested buyers emerged, one of which offered approxi-

was not lawful; (3) the uses proposed in the application were not continuations of prior or existing nonconforming uses, but represented different nonconforming uses. The Board also denied the variance request, concluding that Applicant had not met its burden of showing that a variance was justified. The trial court affirmed.

■ On appeal,[8] Applicant first argues that section 1301.5 of the zoning ordinance is not applicable because this building was merely damaged by the fire, not "destroyed."[9] We disagree.

■ Applicant bases its argument on the fact that section 1301.5 of the zoning ordinance restricts reconstruction of buildings which have been partially or completely destroyed if reconstruction has not commenced within six months, but does not define "partially or completely destroyed." Applicant argues that the common meaning of the word destruction involves more than the damage involved here.[10] However, Applicant appears to forget that in addition to complete destruction, section 1301.5 also speaks of "partial destruction." Black's Law Dictionary defines "partial" as: "Relating to or constituting a part; not complete; not entire or universal; not general or total."[11] Certainly the damage to this building, where the windows, doors and roof needed to be boarded up, electrical wiring was apparently de-

stroyed and the walls scorched, qualifies as a partial destruction.

Second, Applicant contends that the Board erred in holding that the pre-existing nonconforming use of the property had been abandoned. Again, we disagree.

■ In Pennsylvania, abandonment of a nonconforming use requires both proof of intent to abandon and proof of actual abandonment. A municipal ordinance may create a presumption of intent to abandon through expiration of a designated period set forth in the ordinance, but the municipality must still show actual abandonment. *Smith v. Board of Zoning Appeals*, 74 Pa.Commonwealth Ct. 405, 459 A.2d 1350 (1983). Here, sections 1301.1 and 1301.5 of the zoning ordinance create a presumption of intent to abandon if a nonconforming use is discontinued for one year or more if, after complete or partial destruction, reconstruction is not commenced within six months and completed within a reasonable period of time. Applicant failed to successfully rebut this presumption. In addition, the municipality met its burden of establishing actual abandonment because the evidence shows that the nonconforming use of the automobile dealership had moved to a different location in 1977, that after the property was partially destroyed by fire the owner did not commence reconstruction but merely secured the building and that by 1988 and 1989 only debris and some banker's box-

mately $110,000 for the property. (R.R. at A826–27.)

8. Our scope of review in a zoning matter where the trial court took no additional evidence is limited to determining whether the zoning hearing board committed a manifest abuse of discretion or an error of law. *Valley View Civic Association v. Zoning Board of Adjustment*, 501 Pa. 550, 462 A.2d 637 (1983). A conclusion that the Board abused its discretion may be reached only if the Board's findings are not supported by substantial evidence. *Id.*

9. Applicant also contends that if the zoning ordinance provision is interpreted to prevent reconstruction of a nonconforming use which has not been completely destroyed, the provision is unconstitutional. However, a mere claim of unconstitutionality, without more, is not sufficiently specific for us to address. Applicant does not cite to any constitutional provision nor state how or why it believes such an interpretation of the zoning ordinance would be unconstitutional. It

is not our role to invent arguments for appellants. Pa. R.A.P. 2118 and 2119.

10. Applicant states that the word "destroy" is defined by Ballentine's Law Dictionary (3rd ed.) as: "To tear down; to cause to perish; to break into pieces; to burn up; to make useless for service, beyond hope of recovery of value, as by wrecking a ship through casting her upon rocks or shoals," and by Webster's Dictionary (New American Edition) as: "To pull down; to turn to rubble; to put an end to, to annihilate." Applicant does not refer us to Black's Law Dictionary where it is noted that the term "is susceptible of applications in a variety of contexts.... As used in policies of insurance, leases, and in maritime law, *and under various statutes*, this term is often applied to an act which renders the subject useless for its intended purpose, though it does not literally demolish or annihilate it." Black's Law Dictionary 404 (5th ed. 1979) (emphasis added).

11. Black's Law Dictionary 1007 (5th ed. 1979).

es were on the premises and the property was boarded up. (R.R. at A544; Board's Findings of Fact, Nos. 23 and 25.) Thus, the municipality has met its burden of proving both intent to abandon and actual abandonment.

■ Applicant attempts to refute this proof of abandonment, arguing that the nonconforming use was not abandoned because of Applicant's continuing efforts to lease or sell the property.[12] This argument is not applicable here where Applicant's failure to commence repairs to the building within the prescribed time was a matter within its control.

■ Third, Applicant argues that the Board abused its discretion by refusing to allow Applicant to change from one nonconforming use to another nonconforming use. Here, because Applicant did not apply for a change in the nonconforming use while a valid nonconforming use remained in effect, section 1301.2 does not apply.

Finally, Applicant contends that the Board abused its discretion or committed an error of law by denying Applicant's request for a variance to use the building for non-residential purposes. We disagree.

■ Pursuant to section 910.2 of the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. § 10910.2, a variance is appropriate where there are unique physical circumstances or conditions relating to the property which create unnecessary hardship. That hardship must be due to the conditions of the property, not to circumstances generally pertaining in the neighborhood; the unnecessary hardship must not have been created by the applicant; the variance must not alter the essential character of neighborhood; and the variance must represent the minimum variance necessary to afford relief. Applicant simply does not meet these conditions. Fur-

thermore, Applicant ignores an appraiser's testimony, credited by the Board, that the highest and best use of the property would be razing the existing building and constructing townhouses.[13] (Board's Findings of Fact, No. 32.) Despite the fact that Applicant may believe that the property has greater value if used for commercial purposes, Applicant has not shown that the property is economically useless without the variance. *Kelly v. Zoning Hearing Board of Upper Moreland Township,* 87 Pa.Commonwealth Ct. 534, 487 A.2d 1043 (1985). In short, Applicant failed to meet its burden of proving the unnecessary hardship sufficient to justify a variance.

Accordingly, we affirm.

### *ORDER*

AND NOW, this 6th day of December, 1994, the order of the Court of Common Pleas of Lehigh County, dated January 27, 1994, is affirmed.

---

12. In support of this argument, Applicant cites *Grace Building Company v. Zoning Hearing Board of Allentown,* 38 Pa.Commonwealth Ct. 193, 392 A.2d 892 (1978), a case where the owner was attempting to sell or lease the property during the period of non-use. There, however, cessation of use was ineffective to show abandon-

ment because the discontinuance of the business was beyond the owner's control. *Id.*

13. In addition, the record contains testimony that the building as it exists has been so damaged and neglected as to be little more than a shell. (R.R. at A965.)